UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ERNEST SANDERS, GLORIA COBBS,
and CHRISTINE TUZZOLINO,

        Plaintiffs,

        vs.

MID CITY SALON RESOURCES, LLC
and DAVID MONTAGUE,

        Defendants.

No. 06 C 3971

Judge Joan H. Lefkow

## MEMORANDUM OPINION AND ORDER

Ernest Sanders, Gloria Cobbs, and Christine Tuzzolino (collectively, "plaintiffs") brought

suit against their former employer, Mid City Salon Resources, LLC ("Mid City"), and David

Montague (collectively, "defendants"), alleging three counts of employment discrimination under

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3, and the Fair Labor Standards Act

("FLSA"), 29 U.S.C. § 215(a)(3). In Count I, Ernest Sanders brings a claim of retaliation under

Title VII, alleging that he was fired for being a witness to the sexual harassment of his co-worker,

Gloria Cobbs. In Count II, Christine Tuzzolino brings a claim of retaliation under Title VII,

alleging that she was fired for complaining about sexual harassment in the workplace. In Count

III, Gloria Cobbs brings claims of sexual harassment and retaliation under Title VII, as well as

retaliation under the FLSA. Before the court is defendants' motion for summary judgment. For

the reasons discussed below, defendants' motion for summary judgment [#60] is granted with

respect to Sanders's retaliation claim and Cobbs's FLSA retaliation claim and is denied with

respect to Tuzzolino's retaliation claim, Cobbs's Title VII sexual harassment claim, and Cobbs's Title VII retaliation claim.

## **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

### **STANDARDS**

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in the depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c) & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact is one that might affect the outcome of the suit. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In the context of employment discrimination, "summary judgment is warranted where the evidence, interpreted favorably to the plaintiff, could not persuade a reasonable jury that the

2

employer had discriminated against the plaintiff." *Jones* v. *Union Pacific R.R. Co.*, 302 F.3d 735, 739–40 (7th Cir. 2002) (internal quotation marks and alterations omitted).

## LOCAL RULE 56.1

Local Rule 56.1(a) provides that a motion for summary judgment must include, *inter alia*, a "statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law." N.D. Ill. R. 56.1(a). This statement of material facts "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." *Id.* Likewise, part (b) of Local Rule 56.1 requires a party opposing summary judgment to file, *inter alia*, a concise response to the movant's statement of material facts. N.D. Ill. R. 56.1(b). For purposes relevant here, that statement is also required to include "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment." N.D. Ill. R. 56.1(b)(3).

Along with their motion for summary judgment, defendants filed a statement of material facts in compliance with Local Rule 56.1. Along with their response memorandum to the motion for summary judgment, plaintiffs filed both a response to defendants' statement of material facts and a "Counter Statement of Material Facts." On September 20, 2007, however, the court struck plaintiffs' "Counter Statement of Material Facts" and denied plaintiffs leave to refile. Dkt. No. 104. As the court also noted in the same order, the present motion for summary judgment will therefore be decided based on the facts presented in the defendants' statement of material facts and plaintiffs' response to it. *Id.*; *see also Koszola* v. *Board of Educ. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2002) ("[W]e have emphasized the importance of local rules and

3

have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment. This means that a district court is entitled to decide the motion based on the factual record outlined in the [Local Rule 56.1] statements.") (internal quotation marks and citations omitted).

## BACKGROUND[1]

### Cobbs

Mid City distributes beauty products for the salon industry. Defs.' Rule 56.1 Statement of Material Facts ("Defs.' Statement") ¶ 13. Mid City hired Cobbs in July 2005 as a "picker," a position in which she was responsible for going throughout the warehouse and "picking" or collecting whatever merchandise was on an order; once the order was completed, it was brought to "packing." *Id.* ¶¶ 12, 14. Cobbs's employment ended on November 10, 2005.

Montague was Cobbs's supervisor. *Id.* ¶ 12. Cobbs alleges that Montague sexually harassed her when, on six separate occasions during the five months she worked for Mid City, he massaged and touched the top of her shoulders for roughly three or four seconds. *Id.* ¶ 16. The first incident allegedly occurred on August 2, 2005, though Cobbs did not say anything to Montague or anyone else in management about the incident. *Id.* ¶ 17. The second incident allegedly occurred on September 7, 2005, at which time Cobbs asked Montague not to touch her and he stopped. *Id.* ¶ 18. The third incident allegedly occurred on October 3, 2005, at which time Cobbs again told Montague not to touch her and he agreed to stop. *Id.* ¶ 19. The last three incidents occurred on October 4, 7, and 26, 2005. *Id.*

---

[1] Unless otherwise specified, the facts recited below consist only of those that both parties have admitted.

On another occasion, Montague allegedly told Cobbs that Debbie Ellis, a co-worker of Cobbs, had her nipple pierced, though Cobbs saw Ellis show everyone, including Montague, her pierced nipple. *Id.* ¶ 21. On a separate occasion, Montague told Cobbs that he missed her "gleaming white smile" and that he liked her hairstyles. *Id.* ¶ 22. It is undisputed, however, that Montague never told Cobbs any sexual jokes, talked about her body parts, or otherwise talked about anything of a sexual nature. It is also undisputed that Montague never touched Cobbs anywhere other than her shoulders. *Id.*

Also, on or about October 3, 2005, Antonio Romiro, a co-worker, allegedly patted Cobbs on the "butt," at which time Cobbs told him not to touch her. *Id.* ¶ 20.

Mid City maintained written policies prohibiting harassment of any type (including "sexual, racial, ethnic, disability or age-related") which were set forth in the company's employee handbooks. *Id.* ¶¶ 3, 4. Cobbs has acknowledged receiving Mid City's employee handbook and testified that she understood that Mid City had an open door policy, meaning that she could go to Nancy Manna, the accounting manager, or Forest Colburn, the president, with any such issues. *Id.* ¶¶ 8, 24.

On or about October 27, 2005, Cobbs phoned Manna to complain about Montague and set up a meeting with her. *Id.* ¶ 26. Prior to that date, Cobbs had never complained to either Manna or Colburn about Montague. *Id.* ¶ 25. During the call, which lasted about thirty minutes, Cobbs and Manna spoke about (1) the way Montague talked down to Cobbs, (2) Montague's massaging of her shoulders, (3) alleged favoritism in use of cell phones, attendance, and leaving early, and (4) alleged drinking on the job, although Cobbs never personally observed anyone

drinking on the job. *Id.* ¶ 27. Manna told Cobbs that she would investigate her complaints and set up a meeting with Colburn, which Manna did. *Id.* ¶ 29.

On or about November 4, 2005, while discussing the issue of working over the weekend, Cobbs asked Montague and Victor Sabatino, another supervisor, if the employees that worked the weekend were going to get "double-time" if they worked Sunday. *Id.* ¶ 31. In response, Montague said "No," they never pay double time because "[t]hat's the company policy." *Id.* ¶ 32; *Id.*, Ex. 2 (Cobbs's Dep., Part II), at 188–89.

On November 8, 2005, Cobbs met with Manna, Montague, and Colburn. Defs.' Statement ¶ 33. Cobbs complained about (1) how Montague talked down to her, (2) how Montague favored others with attendance and cell phone usage, (3) drinking on the job, and (4) Romiro hitting Cobbs on the butt. *Id.* Cobbs has admitted, however, that she never asked to use her cell phone in the warehouse and that she does not know that Montague made exceptions to the cell phone policy for other employees. *Id.* ¶ 35. Also during the meeting, Montague raised the issues of Cobbs's poor attendance, slow work pace and mistakes. *Id.* ¶ 34. Manna ended the meeting, promising that she and Colburn would investigate further. *Id.* ¶ 36.

On November 10, 2005, Montague told Cobbs that she was terminated because Cobbs was unhappy and causing tension throughout the warehouse. *Id.* ¶ 37. Montague also noted on Cobbs's separation form her poor attendance, which included her failure to work on Saturday, November 5, 2005.[2] *Id.*

---

[2] Although plaintiffs have denied this fact, their denial merely cites Cobbs's testimony that "Never once my attendance was ever discussed at the termination, and he also fired Christine Tuzzolino for communicating with me." Pls.' Resp. to Defs.' Statement ¶ 37 (quoting Defs.' Statement, Ex. 2 (Cobbs's Dep., Part II), at 157). Local Rule 56.1 requires that "in the case of any disagreement" about a material fact, the party opposing summary judgment must "provide

Cobbs has testified that she had been planning on resigning anyway because she was starting a construction class with Illinois Department of Transportation, though she had not told Montague or the company about it. *Id.* ¶ 38.

On January 4, 2006, Cobbs filed a charge of discrimination alleging sexual harassment and retaliation for complaining of sexual harassment. Defs.' Rule 56.1 Statement of Material Facts (Defs.' Statement) ¶ 9.

### Sanders

Sanders was hired by Mid City in August 1999 as a "packer," a position in which he was responsible for pulling bins off of the conveyor belt and then packing whatever was in the bins into a box. *Id.* ¶ 40. As part of Sanders's 2003 performance appraisal, Montague, who had become Sanders's supervisor, observed that Sanders "[d]oes not come in early or stay late when needed[] [a]nd will not work any Mid City shows." *Id.* ¶ 44. On or about January 4, 2005, Montague gave Sanders his 2004 performance appraisal. As part of the 2004 appraisal, Montague counseled Sanders that Sanders needed to (1) "stay till the end to get orders out," (2) "try to get along with all warehouse employees," and (3) "come in early and stay later when needed." *Id.* ¶ 45. Sanders has admitted that "just about . . . every day" he told Montague that he needed to leave early to pick up his daughter from day care. *Id.* ¶ 49; *Id.*, Ex. 5 (Sanders's Dep.), at 104. Sanders has also testified that Montague had warned him that he was expected to stay at the end of the day until all orders on the belt were completed. Defs' Statement ¶ 50.

---

specific references to the affidavits, parts of the record, and other supporting materials relied upon." N.D. Ill. R. 56.1(b)(3). Because the testimony cited by plaintiffs at best controverts not what Montague wrote in the separation form but rather what he said to Cobbs at the time, plaintiffs' denial is ineffective and this fact is deemed admitted.

On or about November 5, 2005, Sanders failed to report for Saturday work despite receiving notice that everyone was expected to work that day. *Id.* ¶ 51.

On January 6, 2006, Sanders was terminated. *Id.* ¶ 52. Montague told Sanders that Sanders was being terminated because (1) sales were down, (2) the company had had a bad year, and (3) Mid City was downsizing. *Id.* ¶ 53. Montague also mentioned that he would be altering employees' hours and start times but that Sanders need not worry anymore about day care issues. *Id.* ¶ 54.

Sanders has testified that he believes he was terminated for being a witness to sexual harassment.[3] *Id.* ¶ 55. On one occasion, date unknown, Sanders alleges that he witnessed Montague rubbing Cobbs's shoulders. After witnessing this, Montague allegedly improperly accused Sanders of making a mistake packing an order, but then Montague apologized to

---

[3] Although plaintiffs have denied this fact, it is well supported by Sanders's deposition testimony: "The reason I feel that I got fired is not because they downsizing. I feel I got fired because I was a witness to a sexual harassment case. That's my reason . . . ." Defs.' Statement, Ex. 5 (Sanders's Dep.), at 133. Though the previously quoted portion of the transcript is more than sufficient, the court also notes Sanders's further testimony:

> Q. . . . And in your previous answer, you also believed that you expressed your belief that Montague terminated you because you were a witness to sexual harassment; is that correct?
>
> A. Yes.
> Q. And that's your personal belief, correct?
> A. Yes.

*Id.*, Ex. 5 (Sanders's Dep.), at 136. In support of their denial, plaintiffs cite only to "counterstatement ¶¶ 47, 48, 48." Pls.' Response to Defs.' Statement. As discussed above, plaintiffs' counter statement has been stricken as a result of their gross failure to comply with the requirements of Local Rule 56.1. Nevertheless, the court notes that even if it were not stricken, none of the factual sources cited in paragraphs 47 or 48 of plaintiffs' counter statement provide support for plaintiffs' denial. Because plaintiffs have failed to cite competent evidence controverting this fact, it is deemed admitted.

Sanders. Sanders testified that this is the only evidence that he is relying on to prove that Montague terminated Sanders for witnessing sexual harassment. *Id.* ¶ 56. Sanders has admitted that he does not remember when this occurred or how much time elapsed between this incident and his termination. *Id.* ¶ 57.

Sanders testified that he also believes he was terminated for being named in Cobbs's charge of discrimination because he presumes Mid City saw Cobbs's charge before he was terminated but has no specific knowledge in support of this presumption. *Id.* ¶ 58.

## Tuzzolino

Tuzzolino was hired by Mid City in August 2005 as a packer. *Id.* ¶ 59. On one occasion, Romiro allegedly hit Tuzzolino on her butt with a clipboard. She told Romiro never to touch her again and he never did. *Id.* ¶ 61. Tuzzolino claims that Romiro went around hitting women on the butt all the time, using foul language, and saying he worked with a "bunch of bitches," and that Montague would witness his behavior and do nothing. At the same time, Tuzzolino also testified that she never had a problem with Romiro. *Id.* ¶ 62.

Tuzzolino alleges that she complained to Montague about Romiro a month or two before her termination and that Montague said he would talk to Romiro. Tuzzolino complained to no one else in management about this. *Id.* ¶ 63.

Tuzzolino allegedly observed Montague touch Cobbs's shoulders on October 3, 2005. Cobbs told Montague to stop, which he did and then walked away. *Id.* ¶ 64. Tuzzolino also alleges that she witnessed Montague ask Ellis about Ellis's nipple piercing, though Tuzzolino never told Montague that she found this to be inappropriate nor did she complain to Colburn about the incident. *Id.* ¶ 66.

9

Tuzzolino alleges that Montague saw Tuzzolino talking with Cobbs on November 9, 2005. Montague then allegedly called Tuzzolino into his office and told her to stop talking in the warehouse. Montague also said that he was going to address all the talking that was going on with the other employees in the warehouse, which he did. *Id.* ¶ 68. At the November 9, 2005 meeting, Montague told Tuzzolino that if she was not happy at Mid City, she could leave. When Tuzzolino said she liked her job, Montague responded, "then stop talking." *Id.* ¶ 69.

On November 10, 2005, Tuzzolino requested to meet with Montague because she was upset about their November 9, 2005 meeting. *Id.* ¶ 70. Tuzzolino complained to Montague that while he reprimanded her simply for talking, he did nothing when Romiro walked around calling women bitches, whores, and sluts and slapping Cobbs and Ellis on the butt. *Id.* ¶ 71. She also complained about Montague asking Ellis to show him her nipple piercing and for telling Cobbs her teeth turned him on. *Id.* ¶ 72. Montague asked her if she was happy working for Mid City. Tuzzolino responded by asking if she was fired, and Montague replied, "No." *Id.* ¶ 72.

Later that same day, November 10, 2005, Montague allegedly called Tuzzolino into his office and said she was terminated because she was not happy at Mid City. He told her to "go collect unemployment." *Id.* ¶ 74. Montague also noted on Tuzzolino's separation form that Tuzzolino wanted to be let go so that she could collect unemployment. *Id.*

## ANALYSIS

### I. Cobbs's Title VII Hostile Work Environment Sexual Harassment Claim

In order to establish a prima facie case of sexual harassment under Title VII, Cobbs must show that (1) "she was subjected to unwelcome harassment," (2) "the harassment was based on her sex," (3) "the harassment was sufficiently severe or pervasive so as to alter the condition of

her employment and create a hostile or abusive atmosphere," and (4) "there is a basis for employer liability." *Kampmier* v. *Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007). Mid City argues that Cobbs has failed to satisfy the third prong of the prima facie test because the incidences of harassment that Cobbs alleges were neither severe nor pervasive.

To satisfy the third prong, plaintiffs must demonstrate that her work environment was both objectively and subjectively offensive. *Rhodes* v. *Ill. Dep't of Transp.*, 359 F.3d 498, 505 (7th Cir.2004). Cobbs's complaints provide sufficient evidence that she was subjectively offended by Montague and Romiro's conduct.

To determine whether alleged harassment was objectively offensive, the court "must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Adusumilli* v. *City of Chicago*, 164 F.3d 353, 361 (7th Cir. 1998) (quoting *Harris* v. *Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)). The Seventh Circuit has, on numerous occasions, distinguished between conduct that violates Title VII and that which is merely objectionable. In *Hilt-Dyson* v. *City of Chicago*, 282 F.3d 456, 463–64 (7th Cir. 2002), for example, the court held that the plaintiff's allegations that a supervisor rubbed her back, squeezed her shoulder and stared at her chest during a uniform inspection while telling her to raise her arms and open her blazer were isolated incidents that, even when taken together, did not create a sufficient inference of a hostile work environment. Similarly, in *Adusumilli*, the court held that the alleged conduct did not constitute sexual harassment where plaintiff complained of (1) teasing, (2) ambiguous comments about bananas, rubber bands, and low-neck tops, (3) staring

and attempts to make eye contact, and (4) four isolated incidents where a co-worker briefly touched her arm, fingers, or buttocks. 164 F.3d at 361–62. In *Boumehdi* v. *Plastag Holdings, LLC*, 489 F.3d 781 (7th Cir. 2007), in contrast, the court reversed summary judgment where the plaintiff's supervisor had, over the course of less than one year, "made at least eighteen sexist or sexual comments . . . and . . . similar comments were made 'very often.'" *Id.* at 789.

Plaintiffs argue that, considering the record as a whole, there is enough evidence for a reasonable jury to find for Cobbs on the sexual harassment claim, relying on *Boumehdi*, 489 F.3d at 788, for the proposition that comments evincing anti-female animus can support a hostile environment claim. In particular, plaintiffs cite Tuzzolino's testimony that Romiro would say "that he worked with a bunch of bitches," make other similar derogatory comments about women, and slap their butts. Defs.' Statement, Ex. 3 (Tuzzolino's Dep., Pt. I), at 55–56. According to Tuzzolino, Romiro said and did such things on a daily basis from the time she joined the company to the time she left, and did so at a volume that everyone in the warehouse, including Montague, could hear. *Id.* at 56–57. Although plaintiffs have admitted that Tuzzolino herself "never had a problem with Romiro," they argue that she regarded Romiro's behavior as offensive. Pls.' Resp. to Defs.' Statement ¶ 62.

Cobbs's central allegations are that (1) Montague told Cobbs about a co-worker's nipple piercing, (2) Montague told Cobbs that he missed her "gleaming white smile" and that he liked her hairstyles, (3) Romiro patted her on the butt, and (4) in six instances, Montague massaged her shoulders for three to four seconds. Considering these allegations along with Tuzzolino's testimony, the court finds that an issue of material fact exists as to whether Cobbs was subjected to a hostile work environment.

Defendants also argue that Mid City cannot be held liable for the alleged sexual harassment because there is no basis for employer liability. "An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." *Johnson* v. *West*, 218 F.3d 725, 730 (7th Cir. 2000) (citing *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 766, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *Faragher* v. *City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)). "Vicarious liability automatically applies when the harassing supervisor is either (1) indisputably within that class of an employer organization's officials who may be treated as the organization's proxy, or (2) when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. Absent either of these situations, however, an employer may avoid vicarious liability by showing (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 730 (citing *Faragher*, 524 U.S. at 789, 808) (internal quotation marks and citations omitted). For conduct by a co-worker, on the other hand, an employer will be liable if it "was negligent either in discovering or remedying the harassment." *Hall* v. *Bodine Elec. Co.*, 276 F.3d 345, 356 (7th Cir. 2002) (internal quotation marks and citations omitted). "An employer's legal duty in co-employee harassment cases will be discharged if it takes reasonable steps to discover and rectify acts of sexual harassment by its employees." *Id.* (internal quotation marks and citations omitted).

13

With respect to Montague's conduct, defendants argue that while Mid City admittedly terminated Cobbs, plaintiffs have failed to establish a causal connection between her termination and the alleged sexual harassment that she experienced. From this, defendants argue that Mid City must be afforded the benefit of the *Faragher/Ellerth* affirmative defense. As discussed below with respect to Cobbs's Title VII retaliation claim, however, plaintiffs have proffered evidence sufficient for a jury to reasonably conclude that Montague fired Cobbs because she complained to him and his supervisors about his sexually harassing conduct. An issue of material fact thus exists as to whether Mid City is liable for Montague's conduct. *See Johnson*, 218 F.3d 731 ("An employer is vicariously liable for tangible employment actions undertaken *by the harassing supervisor*.").

With respect to Romiro's conduct, defendants contend that Mid City took reasonable measures to discover and rectify acts of sexual harassment by its employees, citing its comprehensive sexual harassment policy and arguing that Cobbs never complained to anyone in management about her co-workers' conduct. But Tuzzolino's testimony regarding Romiro's conduct—which he allegedly engaged in on a daily basis and in the presence of supervisors—provides a basis for a reasonable jury to conclude that Mid City was on notice about, but failed to remedy, a hostile work environment. *See Rhodes* v. *Illinois Dept. of Transp.*, 359 F.3d 498, 506-07 (7th Cir. 2004) ("Generally, we do not consider an employer to be apprised of the harassment unless the employee makes a concerted effort to inform the employer that a problem exists. However, we could charge an employer with constructive notice where the harassment is sufficiently obvious.") (internal quotation marks and citations omitted).

14

Given the issues of material fact as to whether Cobbs was subjected to a hostile work environment and whether there is a basis for employer liability, summary judgment must be denied with respect to Cobbs's Title VII sexual harassment complaint.

## II. Cobbs's FLSA Retaliation Claim

Cobbs alleges that she was discharged, in part, for stating that she would not work on a weekend or Sunday without being paid overtime. To establish a claim for retaliation under the FLSA, Cobbs must show that she "report[ed] conduct 'under' or 'related to' violations of the federal minimum wage or maximum hour laws, whether or not the employer's conduct did in fact violate those laws," and that she "had a good-faith belief that [the FLSA] might be violated." *Sapperstein* v. *Hager*, 188 F.3d 852, 857 (7th Cir. 1999).

Defendants argue that Cobbs has failed to provide evidence that she held a good-faith belief that Mid City violated the FLSA. Cobbs's deposition testimony concerning her alleged overtime complaint is at times unclear, with Cobbs referring to both "time and a half" and "double time," as well as "double time and a half." The court finds that her testimony is clear enough, however, about the nature of her inquiry, which was, in her words, about

> time and half, double time on Sunday used to give some companies. *It is not mandatory that they have to give it to you*, but it was just a question. It wasn't like you going to pay me. I'm going to make you pay me. No, it was a question. Are we going to get paid -- since we get time and a half on Saturday, do Sundays runs over to double time? He said no and that was the inventory.

Defs.' Statement, Ex. 2 (Cobbs's Dep., Pt. II), at 182–83 (emphasis added). This testimony indicates that when she inquired on November 4, 2005 about receiving overtime wages for working on Sunday, Cobbs did not have a good-faith belief that she was legally entitled to double time wages; rather, she was inquiring about whether the company had a discretionary policy of paying double time on Sundays, which she understood not to be mandatory. *See also* Defs.'

Statement ¶ 32 (noting Cobbs's further testimony that "it really wasn't an overtime issue. It was just a question answered, no.").

Plaintiffs have failed to cite any competent evidence showing that Cobbs either had or expressed a good-faith belief that Mid City might be violating overtime laws.[4] The court must therefore grant summary judgment in favor of the defendants on Cobbs's FLSA retaliation claim.

## III. Cobbs's Title VII Retaliation Claim

Cobbs has also brought a Title VII claim for retaliation, alleging that she was fired because she complained about sexual harassment. As with other Title VII claims, a claim for retaliation can be established through either a direct or an indirect method of proof:

> The plaintiff in a retaliation case should have two (and only two) distinct routes to obtaining/preventing summary judgment. One, the more straightforward, the one that is unrelated to *McDonnell Douglas* [*Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed.2d 668 (1973)], is to present direct evidence . . . that he engaged in protected activity . . . and as a result suffered the adverse employment action of which he complains. If the evidence is uncontradicted, the plaintiff is entitled to summary judgment. If it is contradicted, the case must be tried unless the defendant presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had had no retaliatory motive; in that event the defendant is entitled to summary judgment because he has shown that the plaintiff wasn't harmed by retaliation.

> \* \* \*

> The second route to summary judgment, the adaptation of *McDonnell Douglas* to the retaliation context, requires the plaintiff to show that after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment. Otherwise there must be a trial.

---

[4] The court also notes Cobbs's testimony that in addition to her inquiry on November 4, 2005, she also asked Manna about receiving double time at the November 8, 2005 meeting. Cobbs's testimony about that meeting, however, provides no indication that Cobbs either believed or expressed the belief that she was legally entitled to double time.

*Stone* v. *City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *accord Bernier* v. *Morningstar, Inc*, 495 F.3d 369, 375–76 (7th Cir. 2007).

Plaintiffs have elected to proceed under the direct method for all of their retaliation claims and thus must demonstrate that Cobbs "(1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and (3) that a causal connection exists between the two." *Tomanovich* v. *City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006). There is no question that Cobbs satisfied the first two elements when she (1) complained about sexual harassment and (2) was terminated. At issue is the third element—whether or not plaintiffs have demonstrated a causal connection between her complaints and her termination.

Under the direct method, a plaintiff may present "[d]irect evidence . . . that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Rhodes* v. *Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Defendants concede that, alternatively, "[a] plaintiff can also prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that "allows a jury to infer intentional discrimination by the decisionmaker," so long as that circumstantial evidence "point[s] directly to a discriminatory reason for the employer's action." *Id.*

Defendants contend that plaintiffs' only argument in support of causation is suspicious timing and cite *Culver* v. *Gorman & Co.*, 416 F.3d 540 (7th Cir. 2005), for the proposition that "suspicious timing may permit a plaintiff to survive summary judgment *if there is other evidence that supports the inference of a causal link.*" *Id.* at 546 (emphasis added). In addition to the fact that Cobbs was fired on November 10, 2005, only two days after complaining about sexual harassment to Montague, Manna and Colburn, plaintiffs also cite a number of other facts to

17

support causation. For example, plaintiffs point out that Montague, the subject of Cobbs's sexual harassment complaints, was the person who terminated her. Plaintiffs also note that Montague's stated reason for terminating Cobbs was that she was "unhappy and causing tension throughout the warehouse." Defs.' Statement ¶ 37. A jury could reasonably conclude, in light of all the evidence, that Cobbs was fired because she complained about sexual harassment.

## IV. Tuzzolino's Title VII Retaliation Claim

Like Cobbs, Tuzzolino claims that she was fired because she complained about sexual harassment. As with Cobbs's Title VII retaliation claim, plaintiffs are proceeding under the direct method and must therefore demonstrate that Tuzzolino "(1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and (3) that a causal connection exists between the two." *Tomanovich*, 457 F.3d at 663.

Defendants claim that plaintiffs have failed to demonstrate that Tuzzolino was terminated for anything other than a legitimate reason. It is undisputed, however, that Tuzzolino met with Montague on November 10, 2005 and complained to him about sexual harassment in the workplace. Specifically, Tuzzolino allegedly complained that while Montague did nothing when Romiro walked around calling women bitches, whores, and sluts and slapping Cobbs and Ellis on the butt, Tuzzolino was reprimanded simply for talking. She also complained about Montague asking Ellis to show him her nipple piercing and for telling Cobbs her teeth turned him on. Later that same day, shortly after terminating Cobbs, Montague called Tuzzolino into his office and told her that she was terminated because she was not happy at Mid City. Given these facts, the court finds that plaintiffs have presented sufficient evidence for a reasonable jury to conclude that Cobbs was fired because she complained about sexual harassment.

18

## V. Sanders's Title VII Retaliation Claim

In their amended complaint, plaintiffs claim that Sanders was terminated because he (1) witnessed Montague sexually harass Cobbs and (2) was named as a witness in Cobbs's sexual harassment complaint. In their response to defendants' motion for summary judgment, plaintiffs also allege two additional reasons for Sanders's termination: (3) that at some time early in Sanders's employment with Mid City, he complained to upper management about a problem he had with Montague; and (4) that Sanders witnessed "Cobbs's opposition to working a weekend without overtime wages." Pls.' Resp. at 11. As with Cobbs and Tuzzolino's retaliation claims, plaintiffs must demonstrate that Sanders "(1) engaged in a statutorily protected activity; (2) suffered an adverse employment action; and (3) that a causal connection exists between the two." *Tomanovich*, 457 F.3d at 663.

Defendants persuasively argue that Sanders has failed to demonstrate causation. First, plaintiffs have failed to show that Sanders voiced opposition when Montague allegedly massaged Cobbs's shoulders, and thus Montague could not have known that Sanders engaged in protected activity. Likewise, plaintiffs have failed to present evidence that on January 6, 2006, the day that Sanders was fired, anyone at Mid City was aware that Cobbs had filed a charge of discrimination two days earlier, much less that Sanders had been named as a witness in her complaint. As the Seventh Circuit has explained, under the direct method, it is not sufficient that Montague "*could* or even *should* have known about" Sanders's objections to Montague's touching of Cobbs's shoulders or Sanders's status as a witness to Cobbs's sexual harassment allegations; rather Montague must have had actual knowledge for his decisions to be retaliatory. *See Luckie* v. *Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004).

Plaintiffs also fail to establish causation regarding the third protected activity in which Sanders allegedly engaged—complaining to upper management that Montague had made a racial slur in which he referred to Sanders's "black ass." Not only did plaintiffs fail to allege any such allegations in their complaint, but this incident occurred, according to plaintiffs, at some unspecified date early in Sanders's employment with Mid City, which began in 1999—as many as five years before he was terminated. In any case, the plaintiffs have failed to proffer evidence on which a reasonable jury could rely to find that Sanders was terminated because he complained about Montague's racially-derogatory comments.

Finally, with respect to Sanders's fourth alleged protected activity—his witnessing of Cobbs's FLSA complaint—plaintiffs have failed to present evidence that Cobbs herself ever made such a complaint. As discussed above, even accepting Cobbs's testimony, plaintiffs have shown only that she inquired about whether double time would be paid for working on Sundays, not that she believed (or expressed the belief) that Mid City was violating the law with respect to overtime wages. Given that Cobbs herself cannot support a claim for retaliation under the FLSA, Sanders's FLSA retaliation claim—which rests entirely on his witnessing of the same events alleged by Cobbs—must also fail. Sanders, moreover, did not raise an FLSA retaliation claim in the plaintiffs' amended complaint. Although plaintiffs claim that "the complaint could be amended to include this claim, as the statute of limitations has not yet expired," Pls.' Resp. at 11 n.6, the Seventh Circuit has established that "[a] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Shanahan* v. *City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996).

20

Because Sanders has failed to provide competent evidence of a causal connection between his termination and any of the four protected activities in which he allegedly engaged, his retaliation claim fails. The court must therefore grant summary judgment in favor of the defendants on Sanders's retaliation claim.

## CONCLUSION

For the reasons discussed above, defendants' motion for summary judgment [#60] is granted in part and denied in part. Summary judgment in favor of the defendants is granted with respect to Sanders's retaliation claim (Count I) and Cobbs's FLSA retaliation claim, but denied with respect to Tuzzolino's retaliation claim, Cobbs's Title VII sexual harassment claim, and Cobbs's Title VII retaliation claim. Because summary judgment has been granted on Cobbs's FLSA claim, the remaining claims are all brought solely under Title VII. As individuals cannot be held liable under Title VII, *see EEOC* v. *AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1281–82 (7th Cir. 1995), Montague—the only individual defendant—is dismissed as a defendant in this case.

Dated: January 23, 2008                    Enter: _Joan H. Lefkow_

                                           JOAN HUMPHREY LEFKOW
                                           United States District Judge